**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| HORACE FORD, | CASE NO. 1:22-CV-00524-BYP |
| Plaintiff, | |
| | JUDGE BENITA Y. PEARSON |
| vs. | |
| | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Horace Ford ("Plaintiff" or "Mr. Ford") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of

the Commissioner be **REVERSED** and **REMANDED**.  On remand, the ALJ should: consider

all evidence relevant to Mr. Ford's ability to interact and relate to others; articulate her finding as

to Mr. Ford's level of limitation in that domain in a way that creates an accurate and logical

bridge between the evidence and her conclusion; and adopt a residual functional capacity that

appropriately accounts for the designated level of limitation.

## I.      Procedural History

Mr. Ford received an unfavorable decision on an earlier application for SSI on December

5, 2018.  (Tr. 107-22.)  On October 17, 2019, Mr. Ford again filed an application for SSI.  (Tr.

136.)  He alleged a disability onset date of June 6, 2009 (*id.*), later amended to October 17, 2019, the date he submitted his application for benefits (Tr. 347).  He alleged disability due to carpal tunnel syndrome, four bad discs in his back, schizophrenia, arthritis in his hands, arms, and legs, asthma, and bronchitis.  (*Id.*)  Mr. Ford's application was denied at the initial level (Tr. 145) and upon reconsideration (Tr. 154) and he requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 193.)  A telephonic hearing was held before the ALJ on December 16, 2020 (Tr. 79-106), after which the ALJ issued an unfavorable decision on January 15, 2021.  (Tr. 155-69.)  The Appeals Council remanded this decision and a second hearing was held on December 15, 2021.  (Tr.  50-78.)

On January 20, 2022, the ALJ issued a decision finding Mr. Ford had not been under a disability within the meaning of the Social Security Act since October 17, 2019, the date his application was filed.  (Tr. 11-24.)  On March 3, 2022, the Appeals Council denied Mr. Ford's request for review, making the ALJ's January 20, 2022 decision the final decision of the Commissioner.  (Tr. 1-3.)

On April 2, 2022, Mr. Ford filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The case has been fully briefed.  (ECF Docs. 7, 8.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Mr. Ford was born in 1967 and was 51 years old on the date his application was filed, making him an individual closely approaching advanced age under Social Security regulations.  (Tr. 23.)  Mr. Ford has a limited education.  (*Id*.)  Mr. Ford testified that he had driven for Uber after the alleged onset date, but the ALJ determined this work did not rise to the level of substantial gainful activity.  (Tr. 17.)

**B.**     **Medical Evidence**

    **1.**     **Relevant Treatment History**

        **i.**     **Mental Impairments**

Mr. Ford's primary care physician, Jeffrey Rosenberg, M.D, referred him to Eliot Gutow, LISW, for treatment of depression. (Tr. 732.)  On December 28, 2018, Mr. Ford attended counseling with Mr. Gutow.  (Tr. 692, 799.)  On examination, Mr. Ford was well-groomed, cooperative, and oriented. (Tr. 693, 800.)   His speech was normal, his thought processes were logical and organized, and no abnormal thought processes were noted.  (*Id.*)  His judgment and insight were good, recent and remote memory normal, and his attention span and concentration were sustained.  (*Id.*)  His mood was dysphoric, but his affect was full.  (*Id.*)

On January 10, 2019, Mr. Ford reported to Mr. Gutow that he felt his relatives did not want him to visit because he brought bad sprits with him.  (Tr. 685, 805.)  On examination, he was well groomed, cooperative, and oriented.  (Tr. 686, 806.)  His speech was normal, but he displayed a tangential thought process, tight associations, and irritable mood.  (*Id.*)  He also affirmed abnormal/psychotic thoughts. (*Id.*)

On January 15, 2019, Mr. Ford underwent an initial diagnostic assessment, completed by Sharon Roesner, CNP.  (Tr. 674, 811.)  He reported psychotic episodes since he was five years old, where he saw things and heard voices.  (Tr. 675, 811-12.)  These episodes manifested as something tapping him, his dead brother visiting him, or his dead girlfriend spelling things out with his shoes.  (*Id.*)  Mr. Ford reported having panic at night because he saw his dead brother. (*Id.*)  He explained he put a chair by his bedside every night for his brother, and would talk to his brother but not look at him.  (*Id.*)  On examination, Mr. Ford was cooperative and oriented to time, person, and place, but his speech was pressured and his thought processes exhibited

loosened associations.  (Tr. 677, 814-15.)  He had paranoid thoughts, including seeing his brother and visions.  (*Id.*)  His affect was full, his attention and concentration were sustained, and his judgment and insight were fair.  (Tr. 678, 815.)  NP Roesner diagnosed Mr. Ford with paranoid schizophrenia, major depression (mild), and generalized anxiety disorder.  (*Id.*)  She prescribed Zyprexa 5 mg and Zoloft 50 mg daily.  (*Id.*)  He was instructed to follow up in two months.  (Tr. 679, 816.)

At his biweekly behavioral health appointments with Mr. Gutow from January through July 2019, Mr. Ford was noted to be well-groomed, cooperative, and oriented.  (Tr. 820-21, 825-26, 842-43, 847-48, 852-53, 862-63, 884-85.)  His speech was normal and his thought processes were logical and organized, with no abnormal thought processes.  (*Id.*)  His judgment and insight were good, recent and remote memory were normal, and his attention span and concentration were sustained.  (*Id.*)  His mood was dysphoric, but his affect was full.  (*Id.*)  His examination results were similar at his visit on February 28, 2019, but Mr. Gutow also noted a mild impairment in abnormal/psychotic thoughts.  (Tr. 837-38.)  Mr. Ford reported conflict with his girlfriend and that they were sleeping in separate rooms.  (Tr. 837.)

On May 16, 2019, Mr. Ford met with NP Roesner for medication management.  (Tr. 866.)  He reported that Zyprexa (olanzapine) made him tired, and that he continued to see spirits and hear whispering in his ear.  (Tr. 867.)  NP Roesner increased his sertraline (Zoloft) prescription to 100 mg and changed from olanzapine to Abilify.  (*Id.*)  At a follow up on July 9, 2019, Mr. Ford reported increased anxiety from the increased dose of Zoloft; NP Roesner decreased Zoloft back to 50 mg.  (Tr. 878.)  Mr. Ford reported continued visions.  (*Id.*)  He recounted that his father tried to beat him as a child, but something grabbed his father's arm and

threw him across the room.  (*Id.*)  He continued to report conflict with his girlfriend, who called him the "devil."  (*Id.*)

On August 21, 2019, Mr. Ford transferred to a new behavioral health provider, Elevani Fletcher, LPCC-S.  (Tr. 889.)  Mr. Ford reported spirits bothering him, and that he became depressed because people didn't understand him.  (*Id.*)  He also reported taking his medications intermittently.  (*Id.*)  He took Zoloft as prescribed, but took Abilify every other day.  (*Id.*)  On examination, Mr. Ford was well groomed, cooperative, and oriented.  (Tr. 890.)  His recent and remote memory was within normal limits and his attention span and concentration were sustained.  (*Id.*)  His mood was euthymic and his affect full.  (*Id.*)  His thought processes were logical and organized, but with tangential associations.  (*Id.*)  He reported psychotic thoughts. (*Id.*)  Mr. Ford's October 4, 2019 mental status examination findings were similar.  (Tr. 896.)  At the October visit, Mr. Ford reported conflict with his girlfriend and others around him, including getting frustrated and angry because he thought others could hear the voices and believed his girlfriend was lying when she said she didn't hear anything.  (Tr. 895.)

At his appointment with Ms. Fletcher on November 8, 2019, Mr. Ford reported side effects from his medications, including headaches, GI upset, and feeling depressed after taking sertraline.  (Tr. 908.)  He reported that Abilify helped him sleep, but caused drowsiness the next day, and he did not like taking it.  (*Id.*)  Despite encouragement from Ms. Fletcher, Mr. Ford did not want to report these side effects to NP Roesner because he did not feel she understood him. (*Id.*)  Mr. Ford also reported frequent arguments with his girlfriend because he could not determine whether she moved his things or if the spirits did; he suspected it was "an ex-girlfriend that died some time ago."  (Tr. 908.)  Mr. Ford exhibited psychotic thoughts and tangential associations, but otherwise was within normal limits on examination.  (Tr. 909.)

At his January 6 and 27, 2020 appointments with Ms. Fletcher, Mr. Ford continued to focus on the spirits he was seeing.  (Tr. 933, 980.)  He also reported neuropathy in his hands.  (*Id.*)  On examination, he was well-groomed, cooperative, and oriented.  (Tr. 934, 981.)  His memory was within normal limits and he was able to sustain attention and concentration.  (*Id.*)  His mood was euthymic and his affect full.  (*Id.*)  However, his thought processes and associations were tangential and he reported psychotic thoughts, including seeing spirits and hearing the voices of people who died.  (*Id.*)

At his January 9, 2020 medication management appointment with NP Roesner, Mr. Ford reported fighting with his girlfriend and seeing spirits.  (Tr. 940.)  He said he believed he was seeing ghosts and did not have schizophrenia.  (*Id.*)  He reported he was not taking Abilify because he said it "made him feel funny."  (*Id.*)  NP Roesner was unable to get Mr. Ford to take another antipsychotic medication, despite encouragement, and indicated she would make another attempt at his next appointment.  (*Id.*)  On examination, Mr. Ford exhibited paranoid thoughts and reported auditory and visual hallucinations in which spirits wanted to "cross him over."  (*Id.*)  Mr. Ford continued to report similar hallucinations at his appointment on May 28, 2021.  (Tr. 1187-88.)  NP Roesner continued his medications at the same doses.  (Tr. 1189.)

At his February 24, 2020 appointment with Ms. Fletcher, Mr. Ford complained of side effects from his medications and reported only taking Zoloft (sertraline).  (Tr. 989.)  Mr. Ford described being agitated and feeling as if people from social security were following him around.  (*Id.*)  He continued to report fighting with his girlfriend.  (*Id.*)  On March 24, 2020, he again reported he was only taking sertraline and was not taking his antipsychotic mediation.  (Tr. 1016.)

At his November 3, 2020 appointment with Ms. Fletcher, Mr. Ford reported persistent auditory and visual hallucinations, such as his father's spirit throwing something to get his attention.  (Tr. 1109-10.)  He believed his medication was making him worse.  (Tr. 1110.)  On examination, Mr. Ford was agitated, talkative, and had tangential thought processes, tangential associations, and psychotic thoughts; his judgment and insight were fair.  (*Id.*)  Mr. Ford was again very agitated at his December 21, 2020 appointment.  (Tr. 1117.)  He believed that everyone was lying to him, including his attorney.  (*Id.*)  He complained of side effects from his medication, including headaches and chest pain, and reported NP Roesner was aware of the side effects.  (*Id.*)  The spirits continued to bother him.  (*Id.*)  By his April 21, August 12, 2020, and June 8, 2021 appointments, he reported being compliant with his medications.  (Tr. 1011-12, 1088-90, 1194.)

At his July 23, 2021 telephonic appointment with Ms. Fletcher, Mr. Ford reported believing that someone hacked his television and that he was receiving messages through the television.  (Tr. 1230-31.)  He reported psychotropic medication compliance, but continued frustration with spirits.  (Tr. 1231.)  On examination, he was cooperative, oriented to person, place, and time, with normal and spontaneous speech, logical and organized thoughts, normal memory, sustained attention and concentration, appropriate language, an "okay" fund of knowledge, and fair judgment and insight.  (*Id.*)  However, he was also agitated, with tangential thought processes and associations, and reported seeing spirits and hearing voices of people who died.  (*Id.*)  Ms. Fletcher reported that Mr. Ford was amenable to discontinuing counseling.  (*Id.*)

Despite the discussion of discontinuing counseling in July 2021, Mr. Ford returned to services with Ms. Fletcher on August 20, 2021 and continued seeing her at regular intervals.  (Tr. 1237-38, 1251-53.)  He explained that he was "irritated" at the July appointment, but that "it

helps him to have someone to talk to." (Tr. 1238.)  At his appointment on October 18, 2021, Mr.

Ford reported that he thought everyone was trying to kill him, and questioned whether his

girlfriend or her mother were messing with his food.  (Tr. 1258-59.)  Mr. Ford reported

medication compliance and an upcoming appointment with NP Roesner.  (Tr. 1259.)  Ms.

Fletcher reached out to NP Roesner with concerns, and indicated Mr. Ford might benefit from a

CPST worker.  (*Id.*)  NP Roesner followed up with Mr. Ford, but he did not state that his

girlfriend or her mother were poisoning his food.  (Tr. 1266-67.)  NP Roesner also questioned

whether Mr. Ford was taking his medications as prescribed; according to his reported schedule,

Mr. Ford was only taking half of the prescribed Seroquel dosage.  (Tr. 1267.)

### ii.      Physical Impairments

On January 15, 2020, Mr. Ford presented to Laurel Beverley, M.D., for an initial visit for

bilateral hand pain and swelling.  (Tr. 945.)  Mr. Ford reported a 2015 right carpal tunnel release

that did not change his symptoms.  (*Id.*)  On examination, Mr. Ford exhibited a lack of full

extension in his small fingers.  (Tr. 946.)  His motor strength was 5/5 and equal bilaterally,

although his thumb opposition varied from 4-5/5.  (*Id.*)  No atrophy was present, and the Tinel

sign and flexed elbow tests were both negative.  (*Id.*)  Phalen's test was positive to thumb and

index finger after ten seconds.  (*Id.*)  Examination and nerve testing confirmed carpal tunnel

syndrome.  (Tr. 997.)

Dr. Beverley noted that carpal tunnel syndrome is not usually associated with the type of

swelling and aching Mr. Ford described.  (Tr. 947.)  She recommended a workup for alternate

etiology and ordered x-rays.  (*Id.*)  The x-rays confirmed hand osteoarthritis as contributing to

Mr. Ford's symptoms.  (Tr. 946.)  Although he was cautioned that most of his symptoms would

not improve with a carpal tunnel release, Mr. Ford elected to proceed with surgical release on his

left hand.  (*Id.*)  The left carpal tunnel release was performed on February 28, 2020.  (Tr. 997-98.)  At his two-week post-surgery follow up, Mr. Ford reported minimal pain without needing medication, and improvement in numbness and tingling.  (Tr. 1007.)  At a six-week follow up on April 8, 2020 with Dr. Beverley, Mr. Ford reported occasional shooting pain in his left hand, but that the numbness and tingling had resolved since surgery and his range of motion and functional usage had improved.  (Tr. 1018.)

On January 28, 2021, Mr. Ford presented to the emergency department complaining of pain and burning in his left wrist.  (Tr. 1129-32.)  He was discharged to his home with a prescription for naproxen and prednisone and instructions to use a carpal tunnel splint and follow up with Dr. Beverley.  (Tr. 1133.)  At follow up on February 10, 2021, Dr. Beverley indicated the pain was related to osteoarthritis and would not be resolved by surgical intervention.  (Tr. 1149-51.)  Treatment options included arthritis gloves and splinting, NSAIDs, therapy, activity modifications, or cortisone injections.  (Tr. 1150.)

At his August 6 and October 11, 2021 appointments with his primary care physician, Dr. Rosenberg, Mr. Ford reported back pain and increased stiffness.  (Tr. 1296-98.)  Dr. Rosenberg noted degenerative disc disease, lower back pain, and hand pain; he advised sedentary work.  (Tr. 1296.)  Dr. Rosenberg referred Mr. Ford to the Spine Center and recommended naproxen instead of ibuprofen.  (Tr. 1298.)  At his October 27, 2021 appointment for follow up regarding hypertension, Dr. Rosenberg noted Mr. Ford was ambulating with a cane, which helped his lower back pain.  (Tr. 1314.)  On November 18, 2021, Mr. Ford was taking naproxen and had a lidocaine patch for the pain; the naproxen reportedly helped some, but the lidocaine patch provided little relief.  (Tr. 1309.)

2.      **Opinion Evidence**

i.      **Consultative Examination**

On January 16, 2020, Mr. Ford underwent a psychological evaluation conducted by psychologist Herschel Pickholtz, Ed.D.  (Tr. 450-59.)  Mr. Ford reported a history consistent with a mood disorder, but Dr. Pickholtz was unable to determine its severity due to Mr. Ford's "exaggeration and non-compliance with the directives and questions administered during the evaluation." (Tr. 457.)  Dr. Pickholtz noted that Mr. Ford's records indicated a diagnosis of paranoid schizophrenia of unspecified severity.  (*Id.*)

Dr. Pickholtz opined that Mr. Ford had the overall capacity to understand, remember, and carry out instructions for simple work activities, with a slight impairment in more complex work activities.  (Tr. 458.)  At times during the examination, Dr. Pickholtz noted that Mr. Ford put forth little effort and refused to answer questions.  (*Id.*)  This made it difficult for Dr. Pickholtz to assess Mr. Ford's capacity to perform one- or two-step tasks.  (*Id.*)  Similarly, Dr. Pickholtz stated that Mr. Ford's limitations in responding to supervision and relating to coworkers and others were "very difficult to assess due to exaggeration." (Tr. 459.)  He also found that Mr. Ford's capacity "to handle the stresses and pressures of work cannot be assessed in a reliable and valid fashion at the present time." (*Id.*)

In sum, Dr. Pickholtz felt that Mr. Ford could probably work a low-skilled or unskilled job.  (*Id.*)  However, he believed Mr. Ford should not monitor his own benefits if awarded.  (*Id.*)  He noted that Mr. Ford was not a reliable or accurate respondent, and opined that review of psychiatric records would be beneficial in conducting an accurate assessment of Mr. Ford's abilities.  (*Id.*)

On January 14, 2020, Mr. Ford underwent a physical examination conducted by Dorothy Bradford, M.D., in which he put forth good effort.  (Tr. 925-31.)  On examination, Mr. Ford was noted to be muscular, well-developed, well-nourished, and in no acute distress.  (Tr. 926.)  He had no spinal tenderness and no CVA tenderness, but had positive straight leg raising on the left at 30 degrees, sitting and supine.  (Tr. 926, 931.)  Dr. Bradford reported a decreased range of motion in the back, but his notes reflect normal range of motion testing.  (Tr. 926, 929-31.)  Mr. Ford demonstrated an even and regular gait.  (Tr. 926.)  Dr. Bradford reported a decreased left hand grasp, but variously noted 5/5 and 3/5 in bilateral grip strength.  (Tr. 926, 928, 931.)   Dr. Bradford opined "based on history" that Mr. Ford had mild intermittent asthma and schizophrenia.  (Tr. 926.)  He also opined that Mr. Ford's physical examination "support[ed] his allegation of intervertebral disc disease with left radiculopathy and left carpal tunnel syndrome," noting that Mr. Ford's hand grasps were decreased.  (*Id.*)

On May 19, 2021, Mr. Ford underwent a functional capacity assessment by Benjamin Hill, M.D.  (Tr. 1176-83.)  Mr. Ford reported 10/10 pain in his hands that day, describing the pain as constant but varying in intensity.  (Tr. 1177.)  He reported using 800 mg Motrin to relieve his pain, but said he did not take it every day.  (*Id.*)  He also reported chronic lumbar back pain, left greater than right.  (*Id.*)  He stated he had tried ibuprofen, prednisone, and physical therapy for his back (one session in 2015).  (*Id.*)

Mr. Ford reported that he could stand for 10-15 minutes, sit or walk for 15 minutes, lift 20 pounds, bend forward to pick anything up, and twist.  (*Id.*)  He reported that he could not stoop or squat.  (*Id.*)  Mr. Ford was noted to be able to ambulate without an assistive device and independently perform his activities of daily living.  (Tr. 1179.)

On examination, Dr. Hill observed that Mr. Ford had full active range of motion, except as noted, full 5/5 strength, intact sensation, normal reflexes, and a stable, non-antalgic gait, but also displayed tenderness to the MCP and CMC joints and bilateral lumbar paraspinals and a positive facet grind.  (Tr. 1181-82.)  Dr. Hill diagnosed hand osteoarthritis (affecting the first CMC bilaterally), bilateral carpal tunnel syndrome (mild), and lumbar spondylosis.  (Tr. 1182.)

Dr. Hill opined that Mr. Ford had mild functional limitations based on his history and physical examination.  (Tr. 1182.)  More specifically, he opined that Mr. Ford could lift/carry up to twenty pounds at the waist level occasionally, could sit and stand for up to six hours per day, for a maximum of fifteen-minute intervals, and could work at a sedentary level.  (Tr. 1182-83.)  He stated Mr. Ford should avoid repetitive stooping or bending, and avoid lifting from the floor.  (Tr. 1182.)  He found Mr. Ford should not squat or crawl.  (*Id.*)  Dr. Hill cautioned that even sedentary work would prove difficult given the extent of Mr. Ford's disabilities and the nature of his disease course.  (Tr. 1183.)

### ii.        Function Reports

On June 26, 2020, Mr. Ford completed a disability report.  (Tr. 393-400.)  In it, he listed his disabling conditions as mental illness and pain in his back.  (Tr. 393.)  He also described seeing and hearing ghosts who moved his things all day, and said the spirits cooked for him when he was tired.  (Tr. 393, 396.)  Mr. Ford recounted his daily activities as talking to spirits, talking to God, cursing, fussing, and arguing.  (Tr. 394.)  He described dropping things and soreness in his hands due to carpal tunnel syndrome.  (Tr. 396.)  He stated he was unable to be around people and kept to himself.  (Tr. 397-98.)  He also stated he was prescribed glasses and a cane, and used a brace or splint as needed.  (Tr. 399.)

### iii.        State Agency Reviewers

State agency medical reviewer Mehr Siddiqui, M.D., reviewed Mr. Ford's records on March 7, 2020.  (Tr. 142-44.)  Dr. Siddiqui found there was no new and material evidence since the prior ALJ's decision of December 5, 2018, and adopted the residual functional capacity ("RFC") limitations from that opinion.  (Tr. 143.)  Dr. Siddiqui opined that Mr. Ford has the RFC to perform medium work, except he can frequently balance, stoop, kneel, and climb ramps and stairs, can occasionally crouch, and cannot climb ladders, ropes, or scaffolds.  (*Id.*)  He additionally found that Mr. Ford can frequently handle, finger, and feel objects, but must avoid concentrated exposure to pulmonary irritants.  (*Id.*)  At reconsideration on July 3, 2020, Elizabeth Das, M.D., affirmed Dr. Siddiqui's RFC as written.  (Tr. 152-53.)

State agency psychological reviewer Cindy Matyi, Ph.D., reviewed Mr. Ford's mental health records on January 31, 2020.  (Tr. 144.)  As to his mental RFC, Dr. Matyi found the current evidence consistent with the prior ALJ's determination of December 5, 2018 and adopted the limitations from that decision.  (*Id.*)  Dr. Matyi opined that Mr. Ford can perform simple, routine tasks in a low stress work environment, meaning no fast-paced work, strict production quotas, or frequent duty changes.  (*Id.*)  At the reconsideration level on July 2, 2020, Irma Johnston, Psy.D., affirmed Dr. Matyi's findings as written.  (Tr. 153.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the hearing on December 15, 2021, Mr. Ford testified that he lived with his girlfriend and his girlfriend's mother.  (Tr. 57, 63-64.)  His girlfriend did most of the chores around the house, but he was able to make himself breakfast in the morning.  (Tr. 63.)  He had completed ninth or tenth grade, and did not obtain a GED.  (Tr. 57-58.)  He had a valid driver's license, but

did not drive because he did not have a working car.  (Tr. 58.)  He had last worked when he painted a church member's basement for $300.  (*Id.*)

Mr. Ford described a worsening mental health condition.  (Tr. 59-60.)  He stated he had seen "spirits" since childhood.  (*Id.*)  These spirits manifested as family members and others who had passed away, who would "bother" him, "messing with [his] shoes and walking back and forth past [him]" and calling his name.  (Tr. 60.)  Mr. Ford reported taking Seroquel and Zoloft for his mental health condition for the past three years.  (Tr. 62, 67-68.)  He stated that the medications helped to calm him, but that he could still hear the voices talking to him.  (Tr. 62, 68.)  He testified that the voices talked to him every day.  (Tr. 68-69.)  The spirits would also move his things and spell things out with his shoes. (*Id.*)  Mr. Ford described himself as "crazy and evil" because of the voices, and said he kept to himself in the basement of his house.  (Tr. 65.)  He did not trust other people, including his girlfriend.  (Tr. 70.)

Mr. Ford also described swollen hands and complained that worsening pain in his back caused him difficulty walking.  (Tr. 60).  He reported two carpal tunnel surgeries without relief.  (*Id.*)  He indicated that his doctors said they could do nothing to relieve the pain and arthritis in his hands, but also reported that they might consider surgery.  (Tr. 61.)  He also reported taking pain medication, including Motrin and naproxen, for four or five years without relief.  (*Id.*)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 73-78.)  The VE testified that a hypothetical individual of Mr. Ford's age, education and work experience, with the functional limitations described in the ALJ's RFC, could not perform Mr. Ford's prior work, but could perform representative positions in the national economy, including kitchen helper/dishwasher, grocery bagger, or industrial cleaner.  (Tr. 74-75.)  However, if the person would be off task 20%

or more of the time or absent two or more days a month, the VE stated those limitations would preclude competitive employment.  (Tr. 76.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

15

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[1]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In her January 25, 2022 decision, the ALJ made the following findings:[2]

1.      The claimant has not engaged in substantial gainful activity since October 17, 2019, the application date.  (Tr. 17.)

2.      The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, osteoarthritis of the hip and knee, bilateral carpal tunnel syndrome, asthma, obesity, bipolar disorder, schizophrenia, major depressive disorder, and generalized anxiety disorder (*Id.*)

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

4.      The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) with the following additional limitations: frequently balance, stoop, kneel, and climb ramps and stairs, occasionally crouch, and no climbing of ladders, ropes, or scaffolds, frequently handle, finger, and feel objects bilaterally, but he must avoid concentrated exposure to pulmonary irritants, and can perform simple, routine tasks in a low stress work environment, meaning no fast-paced work, strict production quotas, or frequent duty changes.  (Tr. 20.)

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501, *et seq*.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[2] The ALJ's findings are summarized.

5.    The claimant has no past relevant work.  (Tr. 23.)

6.    The claimant was born on November 12, 1967 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed.  (*Id.*)

7.    The claimant has a limited education.  (*Id.*)

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work.  (*Id.*)

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including kitchen helper, grocery bagger, and industrial cleaner.  (Tr. 23-24.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, since October 17, 2019.  (Tr. 24.)

## V.    Plaintiff's Arguments

Mr. Ford raises two issues for review:

I.    Whether the ALJ erred when she found that Mr. Ford's mental impairments did not place any limitations on his ability to interact with others; and

II.    Whether the ALJ erred when she rejected the medical opinion of Mr. Ford's treating physician, Dr. Hill.

(ECF Doc. 7, pp. 1, 16.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)); *see also Blakley*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakley*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'") (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Generally, federal courts review decisions of administrative agencies for harmless error. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009).  Even where an ALJ decision

18

is supported by substantial evidence, the Sixth Circuit explains the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007). A decision also will not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    First Assignment of Error: Whether Substantial Evidence Supported ALJ's Adoption of an RFC with No Social or Interaction Limitations**

In his first assignment of error, Mr. Ford argues that ALJ Catherine Ma ("ALJ Ma") erred when she found that his mental impairments caused "mild limitations" in the domain of interacting with others and therefore did not cause any functional limitations in his ability to interact with others. (ECF Doc. 7, pp. 14-16.)  In support, Mr. Ford points out that ALJ Ma previously found he had "moderate limitations" in that domain in a 2021 decision that was remanded by the Appeals Council ("AC"). (*Id.* at pp. 14-15.)  Although the AC remanded the 2021 decision due to ALJ Ma's failure to incorporate interactive limitations in the RFC, ALJ Ma found instead that Mr. Ford's social functioning had improved to the level of "mild" limitations, so that the RFC did not need to include interactive limitations. (*Id.* at p. 15.)  Mr. Ford contends this finding of "mild" limitations is not consistent with the medical evidence of record – which notes hallucinations, delusions, illogical thinking, aggression, and paranoia – and is also not supported by any medical opinion of record. (*Id.* at pp. 15-16.)

The Commissioner responds that substantial evidence supports ALJ Ma's finding that Mr. Ford has only mild limitations in his ability to interact with others. (ECF Doc. 8, pp. 6.)  She notes that ALJ Ma based her findings on mental status examination findings in 2020 and 2021

that noted cooperative behavior and logical / organized thought processes. (*Id.* at pp. 6-7 (citing Tr. 19).) While the Commissioner acknowledges contradictory record evidence, she argues that any consideration of such evidence in this appeal would amount to improperly reweighing the evidence. (*Id.* at p. 7.) She also acknowledges the opinions of the state agency psychological reviewers that Mr. Ford has "moderate limitations" in interacting with others, but asserts that ALJ Ma was not required to adopt those findings verbatim despite finding them persuasive, and that she adequately explained her reasoning for diverging from the opinions. (*Id.* at pp. 7-8.)

### 1. Governing Legal Standard

Generally, a claimant's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)). An ALJ assesses a claimant's "residual functional capacity based on all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(1). "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 342 F. App'x at 157.

It is not a reviewing court's role to "try the case de novo, nor resolve conflicts in evidence," *Garner*, 745 F.2d at 387, and this Court cannot overturn the Commissioner's decision "so long as substantial evidence . . . supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. As noted above, "[s]ubstantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030. Nevertheless, this Court must

consider whether the reasons given to support the RFC "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

In applying these standards, the undersigned will consider whether substantial evidence and "an accurate and logical bridge" support ALJ Ma's conclusion that (1) Mr. Ford's social functioning has improved since the 2018 ALJ decision and (2) the current record supports a finding of no more than "mild" limitations in his ability to interact to interact with others.

### 2. Whether Substantial Evidence Supports Improved Social Functioning

In support of her finding that Mr. Ford has no more than "mild" limitations in the functional domain of interacting with others, ALJ Ma explained:

> In interacting with others, the claimant has a mild limitation. <u>This finding is changed from the prior ALJ decision as there is new and material evidence of a change in the claimant's social functioning since the amended alleged onset date.</u> For example, treatment records note that the claimant was generally cooperative, with appropriate behavior and normal speech [citation omitted]. He also testified that he lives with his girlfriend and her mother, but he primarily stays to himself because they do not get along. However, as noted above, the claimant consistently reports auditory and visual hallucinations. He was also irritable, depressed, and agitated at times.

(Tr. 19 (citing Tr. 1024, 1089-1125, 1156, 1218-67) (emphasis added).) Considering both the articulated reasoning above and the procedural history of the case, the undersigned finds several logical deficiencies in ALJ Ma's finding that new and material evidence demonstrates Mr. Ford's social functioning has improved since the 2018 ALJ decision.

First, ALJ Ma does not clearly explain how the record shows improvement in social functioning since the prior ALJ decision issued by Frederick Andreas ("ALJ Andreas") on December 5, 2018 ("2018 ALJ decision"), and an independent comparison to that decision does not support ALJ Ma's finding of improvement. (*Compare* Tr. 14-24 *with* Tr. 107-22.) In 2018, ALJ Andreas found Mr. Ford had "moderate" limitations in all four mental functional domains, including interacting with others, explaining:

21

The claimant reported that he lives with his girlfriend and he has trouble sleeping. He also endorsed minor problems dressing and bathing, but he is able to manage his personal care independently.  He needs some reminders for medication but he is able to prepare simple meals daily and assist with light house cleaning and laundry.  The claimant is also able to drive, grocery shop with his girlfriend, and manage his personal finances.  Additionally, the claimant denied having any social activities and he has some problems getting along with friends and family. However, he occasionally attends church and medical appointments.  He also spends most of his time watching television, napping, or visiting his mother [citations omitted].

(Tr. 114.)  He then provided the following additional discussion of the mental health records in support of his mental RFC:

[T]he record indicates the claimant suffers from several mental health impairments. However, he has never sought or received specialized mental health treatment.  In August 2017, J. Joseph Konieczny, Ph.D., an independent psychological consultant, examined the claimant.  The claimant reported one remote hospitalization for psychiatric reasons but he denied any other psychiatric treatment.  Nevertheless, he endorsed symptoms including depression, anxiety, crying spells, mood swings, passive suicidal ideation, and subjective visual hallucinations.  However, Dr. Konieczny found no evidence of psychosis, delusions, or response to internal stimuli.  In a mental status examination, the claimant was a poor historian, his eye contact was poor, and he had poor insight and judgment.  However, he was cooperative, he was alert and oriented, his speech was clear and coherent, and his concentration was grossly intact.  Dr. Konieczny diagnosed the claimant with major depressive disorder, recurrent, moderate, generalized anxiety disorder, unspecified psychotic and personality disorders, and BIF [citations omitted].

The claimant also testified at the hearing about ongoing problems with frustration and stress (Hearing Testimony).  However, there is no evidence that he has sought or received mental health treatment.  Moreover, the claimant's orthopedic treatment records make no mention of problems with anxiety or depression [citations omitted].

(Tr. 118 (emphasis added).)

Comparing ALJ Andreas' findings in 2018 with ALJ Ma's findings in 2022 reveals numerous similarities.  Both noted that Mr. Ford was cooperative and had normal speech, but reported hallucinations.  (Tr. 19, 118.)  Both observed that he lived with his girlfriend but reported trouble getting along with others.  (Tr. 19, 114.)  And both detailed the findings of a

22

consultative examiner who noted some abnormal behavior but also numerous normal mental status examination findings.  (Tr. 18-19, 118.)  The most notable difference appears to be ALJ Andreas' observation in 2018 that Mr. Ford had never sought treatment for his mental health impairments (Tr. 18), while the record before ALJ Ma reflected several years of mental health treatment records, including both counseling and medication management (Tr. 22).  Evidence reflecting that Mr. Ford continued to demonstrate similar objective symptoms and make similar subjective complaints, even after initiating behavioral health treatment, does not clearly support a finding that Mr. Ford's social functioning has improved.

Compounding her failure to clearly articulate why she diverged from the 2018 findings, ALJ Ma also fails to explain why she diverged from her own finding in 2021, in the decision vacated and remanded by the AC, that Mr. Ford had "moderate" limitations in interacting with others.  (Tr. 166.)  In the 2021 decision, ALJ Ma found moderate limitations were supported because Mr. Ford "was working for Uber delivering meals" and lived with his girlfriend, but was "depressed and anxious and [] report[ed] audio and visual hallucinations."  (*Id*.)  After reviewing the 2021 decision, the AC observed that the related RFC did "not contain a function-by-function assessment of the most [Mr. Ford] could do in regard to interacting with others" despite findings by ALJ Ma and the state agency consultants that he had "moderate" limitations in that domain, and despite other evidence suggestive of limitations in the ability to interact with others.  (Tr. 176.)  Upon remand, rather than add interaction limitations to the RFC, ALJ Ma instead held that Mr. Ford's ability to interact with others had improved to "mild," and that the RFC therefore did not need to include interaction limitations.  (Tr. 19-20, 23.)  But in making that revised finding, ALJ Ma did not identify what, if any, new evidence or reasoning she relied upon to support the change.  (Tr. 19.)

23

Adding further confusion to her finding that "new and material evidence" shows Mr. Ford's social functioning has improved since 2018, ALJ Ma repeatedly states in that same decision that she has adopted ALJ Andreas' mental RFC limitations because "[t]here is <u>no</u> new and material evidence documenting a change in [Mr. Ford]'s condition since" the alleged onset date. (Tr. 15, 23 (emphasis added).) Thus, she makes internally inconsistent findings that Mr. Ford's social functioning has improved based on "new and material evidence," but that ALJ Andreas' RFC must be adopted because there is "no new and material evidence" that Mr. Ford's condition has changed since the 2018 ALJ Decision.

For the reasons stated, the undersigned finds ALJ Ma has failed to clearly articulate her basis for concluding that Mr. Ford's functional ability to interact with others has improved from "moderate" to "mild" since the 2018 ALJ Decision. In making this finding, she did not adequately explain how the record supports a finding of improvement since the 2018 ALJ Decision, nor does she address the inconsistency between this finding with both her finding of "moderate" limitations in the vacated 2021 decision and her concurrent findings in the present decision that "no new and material evidence" shows a change in Mr. Ford's condition.

### 3.    Impact of Precedent Regarding Consideration of Prior ALJ Decisions

In reviewing the present decision, it appears the logical inconsistencies identified above may stem in part from an attempt to comply with social security rules governing consideration of prior ALJ decisions. In her vacated 2021 decision, ALJ Ma adopted both ALJ Andreas' finding of "moderate" limitations in social functioning <u>and</u> his mental RFC, which did not articulate any social functioning limitations. (Tr. 166-68; *see also* Tr. 114-15.) The AC vacated and remanded the decision, finding the RFC must include "a function-by-function assessment of the most the claimant could do in regard to interacting with others" in light of the finding of "moderate"

limitations in interacting and relating with others.  (Tr. 176.)  This provides some context for the apparently contradictory findings in the present decision, and warrants further discussion of what consideration ALJs must give to the findings of a prior ALJ in relation to the same claimant.

In *Drummond v. Comm'r of Soc. Sec.*, the Sixth Circuit cited to "the principles of res judicata" when it held: "Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." 126 F.3d 837, 841-42 (6th Cir. 1997).  In Acquiescence Ruling 98-4, the Social Security Administration ("SSA") applied *Drummond* as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method of arriving at the finding.

AR 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998).

More recently, in *Earley v. Commissioner*, the Sixth Circuit reexamined *Drummond* and its reliance on principles of res judicata, and observed: "Unusual facts, it seems to us, led to some overstatement in *Drummond* but not to an incorrect outcome."  893 F.3d 929, 933 (6th Cir. 2018).  While the standard in *Drummond* was based on res judicata principles, the *Earley* Court clarified that "res judicata only 'foreclose[s] successive litigation of the very same claim,'" while "'a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'"  *Id.* (citations omitted).  This fact, argued the Sixth Circuit, "helps to explain why *Drummond* referred to 'principles of res judicata' – with an accent on the word 'principles.'"  *Id.* (citing 126 F.3d at 841–43).  In other words, the *Earley* Court held that res judicata is not truly the standard at issue when a claimant seeks benefits for a new period of disability.

25

The Sixth Circuit explained that *Drummond*'s holding did not actually address an issue of "preclusion," but was instead "'best understood as a practical illustration of the substantial evidence rule' in which the prior factual finding was 'such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence.'" *Id.* at 934 (citing *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 476-77 (4th Cir. 1999)). In articulating the standard going forward, the Sixth Circuit explained: "Fresh review is not blind review. A later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* at 934.

Here, it appears that ALJ Ma's attempt to maintain consistency with ALJ Andreas' prior decision had the unfortunate result of undermining the internal logic and consistency of her own decision. Nevertheless, regardless of any findings in 2018, the question before this Court is whether the decision issued on January 25, 2022 is supported by substantial evidence. The reasoning articulated by ALJ Ma in the present case raises serious concerns. She makes simultaneous and contradictory findings that "there is <u>no</u> new and material evidence of a significant change in [Mr. Ford]'s [mental] condition since the amended alleged onset date" (Tr. 23 (emphasis added)) but "there <u>is</u> new and material evidence of a change in [Mr. Ford]'s social functioning since the amended alleged onset date" (Tr. 19 (emphasis added)). Further, a comparison to the 2018 ALJ Decision does not support a conclusion that Mr. Ford's social functioning measurably improved during the current disability period. ALJ Ma did not articulate specific differences between the two periods to support a finding of improvement, and an independent review by the undersigned suggests that the primary difference is that Mr. Ford now participates in regular mental health treatment without a resolution of his objective symptoms and subjective complaints, which is not suggestive of improvement.

Nevertheless, because the *Earley* decision makes it clear that prior ALJ decisions do not have *res judicata* effect, and merely make up a part of a substantial evidence analysis, the undersigned will consider whether the record as a whole provides substantial evidence to support a finding that Mr. Ford has only "mild" limitations in his ability to interact with others.

### 4. Whether Mental RFC Was Supported by Substantial Evidence

Prior to finding that new and material evidence demonstrated improvement in Mr. Ford's social functioning, ALJ Ma noted that psychological consultative examiner Dr. Pickholtz found Mr. Ford's ability to respond to coworkers and supervisors was "difficult to evaluate due to [his] noncompliance and exaggeration during the examination" and concluded that Dr. Pickholtz's objective findings supported "a moderate level of limitation in functioning," explaining:

> For example, Dr. Pickholtz noted that [Mr. Ford]'s estimated verbal IQ is in at least the borderline range. He was adequately dressed and groomed, but his eye contact was sporadic. His speech was also impaired and [he] was not fully cooperative. He reported psychotic symptoms, but did not display any si[gn]s of internalized stimulation or psychotic processing. His mood was a little depressed and affect somewhat constricted, but there were no signs of anxiety. Dr. Pickholtz noted that the claimant put forth little effort and he constantly had to push [Mr. Ford] to respond. Even then, [Mr. Ford] often refused to answer questions.

(Tr. 18-19.) ALJ Ma also noted that state agency psychological consultant Dr. Matyi concluded Mr. Ford had moderate limitations in all functional domains – including the ability to interact with others – which was affirmed upon reconsideration. (Tr. 19.) She found the conclusions of the state agency psychological consultants to be "somewhat persuasive" as generally consistent with the weight of the objective evidence of record, stating:

> For example, in understanding, remembering, or applying information, [Mr. Ford] has a moderate limitation. Treatment records document logical and organized thought process and normal memory [citations omitted]. However, there were reports of auditory and visual hallucinations. There was also mention of racing thoughts at times [citations omitted].

(*Id.*) She also discussed Mr. Ford's mental health treatment records, as follows:

> [I]n March 2020, the claimant was cooperative, with normal speech, and logical and organized thought process [citation omitted].  However, he reported seeing and hearing spirits including his brother.  His mood was depressed and anxious, but affect full.  Attention and concentration were sustained, memory normal, and judgment and insight fair.  On follow-up in May 2021, the claimant's behavior was appropriate, speech normal, and thought process appropriate [citation omitted].  His mood was irritable and depressed and affect full.  The claimant reported auditory and visual hallucinations, but there was no evidence of paranoia.  Attention and concentration were intact, memory normal, and insight and judgment fair.  The claimant was agitated with some racing thoughts, but findings were otherwise essentially unchanged on follow-up [citations omitted].

(Tr. 22.)  In the context of these substantive findings, ALJ Ma found Mr. Ford's limitations in the domain of interacting and relating to others were "mild" because:

> [T]reatment records note that the claimant was generally cooperative, with appropriate behavior and normal speech [citation omitted].  He also testified that he lives with his girlfriend and her mother, but he primarily stays to himself because they do not get along.  However, as noted above, the claimant consistently reports auditory and visual hallucinations.  He was also irritable, depressed, and agitated at times.

(Tr. 19 (citing Tr. 1024, 1089-1125, 1156, 1218-67)

Thus, in assigning "mild" limitations, ALJ Ma acknowledged that Mr. Ford sometimes presented as irritable, depressed, and agitated, that he lived with his girlfriend but stayed to himself because they did not get along, and that he consistently reported auditory and visual hallucinations.  (Tr. 19.)  She also accurately cited to treatment records reflecting that Mr. Ford often presented as cooperative, with appropriate behavior and normal speech.  (*Id.*)  What she did not do, importantly, was articulate how that information fit together to support her conclusion that Mr. Ford has only minimal limitations in interacting with others appropriately, effectively, and on a sustained basis.  *See* 20 C.F.R. § 404.1520a(c)(2), (d)(1).

Specifically, ALJ Ma did not explain her basis for concluding that Mr. Ford's dysphoric mood, irritability, agitation, difficulty getting along with others, paranoid thoughts, reclusiveness, and consistent reports of auditory and visual hallucinations would have no more

than a "minimal" impact on his ability to interact with others appropriately, effectively, and on a sustained basis in a work setting.  Further, she did not explain how her finding of mild limitations in that domain fit with her contemporaneous observation that Dr. Pickholz's opinion supported "a moderate level of limitation" (Tr. 18), and her general finding that the opinions of the state agency psychological consultants (that Mr. Ford had moderate limitations in all four domains) were "somewhat persuasive" (Tr. 19).

The Social Security Administration requires that "all limits on work-related activities resulting from [a] mental impairment must be described in the mental RFC assessment" and recognizes that "[m]edical documentation can often give clues as to functional limitation."  SSR 85-16, 1983-1991 Soc. Sec. Rep. Serv. 352, 1985 WL 56855, *3.  For example, an individual who is "withdrawn or seclusive" may have a "reduced capacity for close contact and interaction with other people," and an individual with "paranoid tendencies" may experience "difficulties in relating to coworkers or supervisors, or in tolerating normal work pressures."  *Id*. at 1985 WL 56855, *3.

Upon review of the decision as a whole, the undersigned finds ALJ Ma has failed to "build an accurate and logical bridge between the evidence and the result," *Fleischer*, 774 F. Supp. 2d at 877, to support her conclusion that Mr. Ford had only mild limitations in his ability to interact and relate with others, and thus no functional limitations in his ability to interact with others.  While she accurately described the evidence, she did not offer a clear explanation for how that evidence supported a finding of no more than mild limitations.  That logical failing was compounded by her additional finding that the state agency consultants were "somewhat persuasive" in finding Mr. Ford had "moderate" limitations in all four domains, without explaining her own decision to assign only mild limitations in one domain.  (Tr. 19.)  That was in

addition to her failure, discussed in Section VI.B.2., *supra*, to clearly articulate: her grounds for finding Mr. Ford's social functioning had improved since 2018; her reasons for changing her findings regarding this domain after her 2021 decision was remanded; and her basis for concluding that new and material evidence showed improvement in this domain even though she also found that no new and material evidence showed a change in Mr. Ford's condition.

For all of the reasons set forth above, the undersigned recommends that the ALJ decision be vacated and remanded for further proceedings consistent with this decision.

**C.    Second Assignment of Error: Whether Substantial Evidence Supported ALJ's Finding That Treating Opinion of Dr. Hill Was Not Persuasive**

In his second assignment of error, Mr. Ford argues that ALJ Ma erred when she found the opinion of treating physician Dr. Hill not persuasive.  (ECF Doc. 7, pp. 16-19.)  He asserts that she erroneously relied on outdated medical opinions, which were undermined by more recent evidence like Dr. Hill's physical functional evaluation.  (*Id.* at p. 17.)  More specifically, he argues that ALJ Ma erred when she dismissed Dr. Hill's opinion because his "findings do not support such extreme limitations" without identifying "any of Dr. Hill's specific findings as being contradictory or in conflict with other evidence."  (*Id.* at p. 18.)  He further argues that she erred in adopting the findings of state agency medical consultant Dr. Siddiqui, who adopted RFC limitations from the 2018 ALJ Decision, because Mr. Ford's health has degraded since 2018. (*Id.*)  The Commissioner responds that ALJ Ma appropriately resolved any conflicts between disparate findings in the record, identified specific findings in Dr. Hill's examination that did not support his opinion, considered Dr. Hill's opinions relative to other findings in the record, and ultimately made findings that were supported by substantial evidence.  (ECF Doc. 8, pp. 8-11.)

Under the Social Security Administration's ("SSA") regulations for evaluation of medical opinion evidence, *see* 20 C.F.R. § 404.1520c, an ALJ must "evaluate the 'persuasiveness' of

medical opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."  *Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (citing 20 C.F.R. § 404.1520c(a) and (b)).  The most important factors are "supportability" and "consistency," with the remaining factors being relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. § 404.1520c(b)(2).  Given the importance of supportability and consistency, the ALJ must explain how she considered those factors and "may, but [is] not required to, explain how [she] considered the [other] factors."  20 C.F.R. § 404.1520c(b)(2).

As a general matter, "supportability" means how well a medical source's own objective findings and explanations support his medical opinion, articulated as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).

In contrast, "consistency" means how consistent a medical opinion is with record evidence from other medical and nonmedical sources, articulated as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).

Here, in support of her finding that Dr. Hill's opinion was not persuasive, ALJ Ma provided the following explanation:

> [Mr. Ford] was evaluated on May 2021 for a functional capacity assessment performed by Benjamin Hill, M.D. [citation omitted]  Dr. Hill concluded that the claimant can lift/carry up to twenty pounds occasionally at waist level. He should avoid repetitive stooping or bending, any crawling or squatting, and lifting from floor level. Dr. Hill also concluded that the claimant can sit fifteen minutes at a time and six hours total and stand fifteen minutes at a time and six hours total. Finally, Dr. Hill concluded that the claimant may be able to work at the sedentary level, but even sedentary work may be difficult.
>
> I do not find the conclusions of Dr. Hill persuasive as they are not well supported by objective signs and findings upon examining the claimant. For example, there was tenderness in the MCP, CMC, PIP, and DIP joints and wrist range of motion was slightly reduced, but strength was intact in the upper extremities. Sensation and reflexes were normal. There was tenderness to the lumbar paraspinals bilaterally; however, strength was intact in the lower extremities. Range of motion of the back was to 100 degrees flexion and 30 degrees extension. These findings do not support such extreme limitations.

(Tr. 21-22 (emphasis added) (citation omitted).)

These findings very clearly address the issue of supportability.  As the Commissioner points out, ALJ Ma directly contrasted Dr. Hill's opinion – that Mr. Ford could only lift/carry up to 20 pounds, should avoid repetitive stooping or bending, should never squat or crawl, and could sit/stand for 15-minute intervals for up to six hours per day – with objective findings in his own examination records that reflected normal strength, sensation, and reflexes in the hands, slightly reduced range of motion in the wrists, normal strength in the legs, and unremarkable range of motion in the back.  (ECF Doc. 8, p. 9 (citing Tr. 1208, 1210-12).)

Focusing more on the issue of "consistency," Mr. Ford argues that Dr. Hill's opinion was "corroborated by other medical evidence from the alleged period of disability," and that "ALJ Ma never identifies any of Dr. Hill's specific findings as being contradictory or in conflict with other evidence."  (ECF Doc. 7, pp. 17-18.)  The Commissioner argues in response that a reading of the opinion as a whole reveals that ALJ Ma "considered Dr. Hill's opinions relative to other

findings in the record" and "pointed to other evidence and administrative findings in the record that were inconsistent with Dr. Hill's opinion." (ECF Doc. 8, pp. 9-10.)

Generally, to articulate a decision supported by substantial evidence, an ALJ is not "required to discuss each piece of data in [her] opinion, so long as [she] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)). An ALJ is also permitted to rely on previously articulated information to support her opinion analysis. *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding no need to require the ALJ to "spell out every fact a second time").

Further, an ALJ "need not necessarily use the words 'supportability' or 'consistency,' as long as the ALJ still performs the requisite analysis of these factors," and a reviewing court is able to follow the ALJ's reasoning. *Todd A. v. Kijakazi*, No. 3:20CV594, 2021 WL 5348668, at *4-5 (E.D. Va. Nov. 16, 2021); *see also Anteer v. Kijakazi*, No. 3:20-CV-00952, 2021 WL 4424475, at *16 (N.D. Ohio Sept. 27, 2021) (finding indication that opinion lacked objective evidentiary support related to supportability and consistency, even though ALJ did not use the terms supportability or consistency).

A review of the decision as a whole reveals that ALJ Ma explicitly considered largely the same evidence highlighted by Mr. Ford as relevant to a "consistency" analysis. (*Compare* Tr. 21-22 (citing, e.g., Tr. 945, 951, 995, 1077, 1079, 1089, 1130, 1149-50, 1163, 1207, 1275, 1297)

*with* ECF Doc. 7, pp. 17-18 (citing, e.g., Tr. 945-46, 951, 997-98, 1149, 1297).)  She described

the same hand x-rays and the same February 2020 carpal tunnel release surgery.  (Tr. 21 (citing

Tr. 951, 995).)  She discussed the same subsequent medical appointments in February and

October 2021.  (Tr. 21-22 (citing Tr. 1149-50, 1297).)  She also addressed other medical records

not highlighted by Mr. Ford, like the April 2020 follow-up appointment where he reported that

his numbness and tingling had resolved since surgery.  (Tr. 21 (citing Tr. 1018).)  With respect to

the February 2021 appointment at which Mr. Ford reported he "continued to endorse pain,

numbness, and swelling in his hands and back throughout the rest of the alleged period of

disability" (ECF Doc. 7, p. 18 (citing 1149)), ALJ Ma noted Mr. Ford had "reported that he

began experiencing the pain in his left hand after doing curls with twenty pound weights" and

that his examination reflected "motor strength was full and Tinel, Phalen, and flexed elbow tests

were negative, but there was a mildly positive grind test" (Tr. 21 (citing 1149-50)).  She then

discussed an April 2021 examination where diffuse swelling, slightly reduced strength, and good

wrist motion were noted.  (Tr. 21 (citing Tr. 1163).)  With respect to the October 2021

appointment that Mr. Ford offered as an example of continued complaints of pain, numbness,

and swelling in his hands and back (ECF Doc. 7, p. 18 (citing 1297)), ALJ Ma correctly

observed that Mr. Ford "reported wrist burning and weakness upon waking, but this resolves

within five minutes" (Tr. 22 (citing Tr. 1297)).

Considering ALJ Ma's thorough discussion of the record evidence concerning Mr. Ford's

physical impairments – and in particular his relatively benign objective findings on examination

– her observation that Dr. Hill's opinions were "not well supported by objective signs and

findings upon examining the claimant" (Tr. 22) could be applied as easily to the "consistency"

analysis as to "supportability."  *See, e.g., Anteer*, 2021 WL 4424475, at *16 ("Although the ALJ

does not use the term supportability or consistency in the above evaluation, the Court concludes that the determination that the opinion appears to 'heavily' rely on Plaintiff's subjective statements is a finding that the opinion lacked objective evidentiary support—relating to supportability and consistency.").

Mr. Ford's argument that ALJ Ma relied inappropriately on the medical opinion of state agency medical consultant Dr. Siddiqui, given evidence of his changed physical condition since the 2018 ALJ Decision (ECF Doc. 7, pp. 18-19), does not change this analysis. Mr. Ford points out that he has had carpal tunnel release surgeries and an x-ray showing osteoarthritis in his hands since the 2018 ALJ Decision (*id.*), but a review of the 2018 ALJ Decision reflects similar complaints and examination findings at the time of the prior decision, as well as a prior carpal tunnel release surgery (Tr. 117). Indeed, ALJ Ma recognized in her own discussion and analysis that Mr. Ford underwent a carpal tunnel release in 2015. (Tr. 21.)

For the reasons set forth above, the undersigned finds ALJ Ma has adequately articulated her basis for finding that Dr. Hill's opinion was not persuasive. She described the limited objective physical examination findings noted by Dr. Hill and found his opinion – that Mr. Ford could perform at most sedentary work, with sitting and standing limited to 15-minute increments, and other postural limitations – was not "well supported" by the examination findings. (Tr. 22.) The same analysis is appropriate under a "consistency" standard based on a review of the other medical evidence outlined in the ALJ decision. It does not escape notice that Dr. Hill's opinion as to Mr. Ford's physical limitations aligns quite closely with Mr. Ford's subjective report to Dr. Hill regarding those limitations. (*Compare* Tr. 1206 *with* 1211.)

While Mr. Ford contends that ALJ Ma should have reached a different conclusion regarding Dr. Hill's opinion based on the evidence of record, the record nevertheless supports a

finding that substantial evidence supported ALJ Ma's conclusion that Dr. Hill's opinion was not persuasive.  This Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Having reviewed the decision as a whole, the undersigned concludes that the ALJ's reasons for finding Dr. Hill's opinion not persuasive are adequately articulated and have the support of substantial evidence.  Accordingly, the undersigned concludes that Mr. Ford's second assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **VACATED and REMANDED**.  On remand, the ALJ should: consider all evidence relevant to Mr. Ford's ability to interact and relate to others; articulate her finding as to Mr. Ford's level of limitation in that domain in a way that creates an accurate and logical bridge between the evidence and her conclusion; and adopt a residual functional capacity that appropriately accounts for the designated level of limitation.

January 31, 2023

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).